# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Abdulaziz Ghedi,                                                    Civil No. 04-2656 (DWF/FLN)

        Plaintiff,

v.

                                    **MEMORANDUM**

International Business Machines, Inc.,                    **OPINION AND ORDER**
a corporation,

        Defendant.

---

Mark G. Stephenson, Esq., Stephenson & Sutcliffe, counsel for Plaintiff.

Holly M. Robbins, Esq., Jerry W. Snider, Esq., and Alissa M. Raddatz, Esq., Faegre & Benson, counsel for Defendant.

---

## Introduction

The above-entitled matter came before the undersigned United States District Judge on April 22, 2005, pursuant to a Motion for Summary Judgment brought by Defendant International Business Machines, Inc. ("IBM"). IBM also brought a Motion to Strike certain allegedly inadmissible evidence filed by Plaintiff Abdulaziz Ghedi. Ghedi opposes the motions. For the reasons set forth below, the Court denies IBM's Motion to Strike, but grants IBM's Motion for Summary Judgment.[1]

---

[1] The Court comes to the same result with regard to IBM's Motion for Summary Judgment whether or not the allegedly inadmissable statements contained in Ghedi's memoranda and affidavits are considered. Therefore, the Court denies IBM's Motion to Strike without additional comment as to its merit.

**Background**

Abdulaziz Ghedi was born in Somalia.  He immigrated to the United States in 1992 and settled in Rochester, Minnesota, in 1999.  Ghedi has associate degrees in electronics, telecommunications, electrical engineering, and the liberal arts.  Ghedi is also a certified professional in Microsoft Windows NT and an A+ technician.

IBM is a large corporation with a manufacturing plant in Rochester, Minnesota.  IBM asserts that it is an equal opportunity employer that does not tolerate harassment or discrimination on the basis of race, national origin, or any other illegal reason.  IBM has an "Open Door" process in place that allows an employee to request a review of and investigation into conduct that the employee believes violates IBM's policies.

In July 1999, Ghedi applied for a position with IBM as a technician.  Ghedi interviewed with Dale Runkle, an IBM manager.  Ghedi alleges that Runkle told him that Ghedi could not be hired for a full-time position because he did not have a degree in electronic engineering.  Therefore, Runkle hired Ghedi as a temporary or supplemental employee at $8 per hour.  Full-time employees were making $15 per hour at the time.

Later, Ghedi asserts that he discovered that Runkle had lied to him about the qualifications necessary to gain full-time employment.  Ghedi claims that IBM hired white employees without degrees for full-time positions shortly after Ghedi began working at IBM.  Specifically, Ghedi asserts that Dax McMillin, a white male without an advanced degree, was hired by IBM to a full-time position several months before Ghedi was hired.

2

On July 18, 2000, Ghedi was offered and accepted a full-time position with IBM.  Ghedi currently works at IBM as a Technician Specialist.  In 2001, Ghedi's manager was Mike Gordon, the manager of a department called FXRB iSeries/pSeries Systems Test.  Gordon reported to i/p Series Systems Manufacturing Manager John Zoller.  Zoller reported to the Plant Manager.  In 2004, Olivier Renault replaced Patrick Reveland as the Plant Manager.

Ghedi asserts that, in his current position, Somali and other minority employees do considerably more work than their white counterparts, but are paid less and are less likely to be promoted.  Specifically, Ghedi claims that minority employees were performing an average of 224.17 tests of a certain type during a one-month period whereas white employees were performing on average 114.17 tests during that same time period.  In addition, Ghedi asserts that he is the highest paid Somali in his shift at $33,538.40 per year, but that white employees on the same pay scale make up to $51,636 a year.  Ghedi also claims that IBM's management rotates white employees into departments that pay more than other departments that are predominately staffed by minority employees.  Finally, Ghedi contends that none of the Somalis in his department have advanced above the band level 3 pay scale.

Ghedi also asserts that his efforts to advance within the company have been quashed.  Specifically, Ghedi asserts that he was denied customer solution center and senior technician specialist positions because of his race.  In February 2001, Ghedi applied for a customer solution center position.  Ghedi and four other candidates were selected to interview for the position. Dax McMillin was ultimately chosen for the position even though Ghedi asserts that McMillin does not have the education or experience necessary for the position.  After being rejected for the position, Ghedi requested information from the hiring manager regarding future work opportunities.  IBM asserts that the hiring

3

manager responded to Ghedi with some constructive criticism and that Ghedi reacted by sending an angry e-mail to the hiring manager.

Ghedi also claims that racism played a role in the fact that he was not hired for a senior technician specialist position in March 2002.  Ghedi interviewed for the position, but Gordon hired another worker, David Dominguez, who had 25 years of experience at IBM.  Gordon asserts that he selected Dominguez based on leadership potential rather than technical expertise.

Both Ghedi and IBM agree that Ghedi has applied for over 50 positions while at IBM.  IBM contends that better qualified persons were hired to fill some of the positions and that at least 20 of those positions were never filled because of plan changes or budgetary constraints.

Ghedi also alleges that more blatant and visible signs of discrimination were present at IBM.  In particular, Ghedi asserts that Reveland, the former plant manager, would not speak with or shake hands with the plant's non-minority employees.  When confronted with this behavior by Ghedi, Reveland admitted that he did not spend as much time with the part-time employees and that he was concerned that shaking hands with the minority employees might violate some of their religious beliefs.

On September 28, 2002, Ghedi went on an extended leave of absence to spend more time with his family and open a business.  Before going on leave, Ghedi and Ghedi's group leader, David Dominguez, got into a disagreement.  Both Ghedi and Dominguez reported the disagreement to Gordon, and the next day Gordon met with the two men.  Gordon told Ghedi that he would need to take direction from Dominguez and also informed Dominguez that he would need to better explain his instructions to Ghedi.

On September 25, 2002, Ghedi sent an e-mail to Zoller claiming that there had been subjected to prejudicial behavior and constant harassment.  Ghedi also complained that Dominguez's selection as team leader was racially motivated.  Zoller investigated Ghedi's claims and asserts that he found no basis for the assertions.

On March 31, 2003, Ghedi returned from his leave of absence.  One month after returning from his leave, Ghedi began a temporary work assignment as a System Administrator/Operator under Margaret Konczyk.  IBM regularly rotates employees between its departments to meet its staffing needs and to teach its employees additional skills.  Ghedi returned to his regular position August 25, 2003.

While Ghedi was on his temporary work assignment, all IBM employees were informed that they would receive a three-percent raise.  Gordon contends that he sent the necessary paperwork to IBM's accounting department to effectuate Ghedi's raise, but he did not receive the raise until he brought the matter to Gordon's attention two months later.  The parties agree that Ghedi received the three-percent increase once he notified Gordon of the fact that he [Ghedi] had not received the raise.

During roughly the same period of time, Ghedi applied for a tuition reimbursement from IBM.  Gordon informed Ghedi that his request for reimbursement might not be approved given budgetary constraints at IBM.  Nonetheless, Gordon discussed the request with Zoller and the tuition reimbursement was ultimately approved.

IBM managers periodically conduct employee evaluations known as Personal Business Commitments.  Employees receive a rating from "1" (extraordinary) to "4" (unsatisfactory).  Before Ghedi left his position with Konczyk, she met with Ghedi to discuss his performance.  At the meeting,

5

Konczyk told Ghedi that if she were to evaluate Ghedi, she would rate him a "3." Later, Gordon met with Ghedi to discuss Ghedi's upcoming performance review. Gordon asserts that he told Ghedi that he [Ghedi] was viewed as arrogant by some of his co-workers. Gordon also told Ghedi that he [Ghedi] seemed to feel that the company owed him something. Ghedi subsequently e-mailed Zoller stating that he was being abused.

On September 9, 2003, Ghedi initiated an Open Door process. Ghedi asserted that he should have been selected for the team leader position that went to Dominguez and that after his previous complaint he had been denied benefits and promotions. IBM commenced an investigation of Ghedi's complaints with Mark Morizio, an IBM executive, leading the investigation.

Morizio asserts that he spent over 80 hours investigating Ghedi's complaints. During the investigation, Morizio examined Ghedi's complaints regarding the performance evaluation and the problems surrounding Ghedi's raise and request for tuition reimbursement. Morizio determined that Ghedi was entitled to the raise and tuition reimbursements. Morizio also determined that IBM's method of evaluating employees that had been rotated through other departments was not consistent. As a result, Morizio recommended that Ghedi be given a "2" on his performance evaluation. Gordon later agreed with Morizio's determinations and changed Ghedi's performance evaluation score to a "2."

Morizio also investigated Ghedi's claim that he was not being paid as much as other employees. Morizio requested an analysis of Ghedi's salary and determined that Ghedi was paid less than other employees within his pay scale. However, the report also showed that Ghedi had worked an average of 4 years less than the average employee in his group.

Finally, Morizio investigated Ghedi's complaints that minorities were excluded from certain

6

meetings with management and that Reveland did not interact with minority employees in the same way that he did with white employees.  Morizio asserts that he found no evidence to support Ghedi's complaint regarding the exclusion of minorities from meetings with management.  Nonetheless, Morizio recommended to Reveland that he make more of an affirmative effort to interact with the plant's minority employees.  Reveland asserts that he accepted the recommendation and altered his behavior accordingly.

In October 2003, Ghedi applied for a Process Engineering Technician position.  The position was a band 4 or 5 position meaning it would have substantially increased Ghedi's compensation.  Kay Momsen, the hiring manager for the position, did not interview Ghedi because she asserts that she was looking for a candidate for whom the position would be a lateral transfer and not a promotion.

A few weeks later, Ghedi applied for a Senior Technician Specialist position.  Ronald Guenther interviewed Ghedi for the position, but selected Eric Mussman to fill the position.  Guenther asserts that he selected Mussman because Mussman had been in a similar position and was already familiar with the position's requirements.

In April 2004, Ghedi submitted an application and was interviewed for a pSeries Technician position.  Mark Steinbauer, the hiring manager, asserts that he considered Ghedi for the position, but chose to fill the position with a candidate who had previously been loaned to his department.

On April 16, 2004, Ghedi filed this suit against IBM alleging that a hostile work environment exists at the IBM plant and that IBM retaliated against him for his opposition to and complaints about discriminatory conduct at IBM.  On May 7, 2004, IBM removed the case from state court to federal court.  IBM now moves the Court for summary judgment on this matter.

## Discussion

### I.       Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *See Enter. Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *See Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

### II.      Statute of Limitations

As a preliminary matter, IBM asserts that certain acts that Ghedi bases his claims upon are barred by the applicable statute of limitations. First, IBM contends Ghedi cannot base his claims on discrete acts occurring outside of the Minnesota Human Rights Act's ("MHRA") one-year statute of

limitations.  In support of this assertion, IBM cites to language in *Mems v. City of St. Paul,* 327 F.3d 771, 784 n.10 (8th Cir. 2003), in which the Eighth Circuit held that a U.S. Supreme Court decision limiting the statute of limitations for certain discrimination statutes " . . . equally affects the vitality of the continuing violation doctrine as it applies to the MHRA." *Id.*  Second, IBM asserts that Ghedi's attempt to avoid the statute of limitations by categorizing his allegations as a pattern and practice claim also must fail.  IBM contends that Ghedi failed to plead such a claim in his Complaint.  IBM also claims that, as an individual, Ghedi cannot bring such a claim.  Finally, IBM claims that Ghedi's assertion that the statute of limitations was suspended while he was engaged in a "dispute resolution process" is in error because the IBM Open Door process does not attempt to resolve disputes of unlawful discrimination.  IBM asserts that only an additional 71-day window would exist even if the Court were to find the statute of limitations was suspended while the Open Door process was ongoing.

Ghedi, on the other hand, asserts that the Court is entitled to examine each act outlined in his Complaint in considering whether to grant summary judgment as to his claims.  First, Ghedi appears to contend that Minnesota courts would interpret the MHRA to allow for the operation of the continuing violations doctrine in order to save some claims that would otherwise be barred.  Second, Ghedi asserts that all of the acts contained in his Complaint can be considered by the Court as part of his individual pattern and practice claim.  Third, Ghedi contends that IBM never told him when the Open Door processes ended and, as such, IBM is barred from asserting a statute of limitations defense.

The Court agrees with IBM that Ghedi's claims are subject to a one-year statute of limitations. The Eighth Circuit held that the MHRA follows federal law in the application of the continuing violation doctrine.  *Mems,* 337 F.3d 771.  Ghedi's counsel may disagree with the Eighth Circuit's decision in

*Mems*, however, that decision serves as binding precedent upon this Court.  The Court also finds that Ghedi cannot avoid the one-year statute of limitations by categorizing his allegations as a pattern and practice claim.  Ghedi did not plead such a claim in his Complaint.  The Court also questions whether an individual, as opposed to a class of individuals, can bring such a claim in light of Ghedi's failure to cite to any case in support of that assertion.  Finally, the Court finds that it need not determine whether the statute of limitations was suspended during the Open Door process because an extension would not serve to bring additional acts before the Court based on the actual period of time that the Open Door process was being utilized.

## III.    Race and National Origin Discrimination

Ghedi asserts that he was discriminated against on the basis of his race and national origin in violation of the MHRA.  In order to establish a *prima facie* case of discrimination based on race or national origin, Ghedi must demonstrate that:  (1) he was a member of a protected group; (2) he was meeting the legitimate expectations of his employer; (3) he suffered an adverse employment action; and (4) similarly situated employees who are not members of the protected group were treated differently. *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000).  The parties do not dispute that Ghedi is a member of a protected class or that he was meeting IBM's legitimate expectations.

If Ghedi is able to establish a *prima facie* case, the burden shifts to IBM to produce a legitimate, non-discriminatory reason for the adverse employment action.  *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  If IBM is able to articulate such a reason, the burden shifts back to Ghedi to show that the proffered reason is merely a pretext for discrimination.  *Id.*

Ghedi sets out several instances that he asserts form the basis of his race and national origin

discrimination claims.  Specifically, Ghedi asserts that he was discriminated against when he:  (1) was not initially hired as a full-time employee; (2) was not paid as much as similarly situated white employees; (3) did not initially receive his 3% raise and tuition reimbursement; (4) was given lesser performance evaluation ratings than he had earned; and (5) was not promoted as quickly as similarly situated white employees.[2]

A.      **Salary Increases**

Ghedi asserts that he has not received salary increases in line with his work achievements and that IBM has not advanced him from band 3 to band 4 on its payscale.  Ghedi presents evidence showing that he is the highest paid Somali employee in his department, but he also presents data showing that the two white employees in his department with similar product repair rates are paid significantly more than he is paid.  Ghedi also alleges that no Somali employee in the department has risen above band 3 of IBM's payscale.

IBM contends that it has not discriminated against Ghedi with regard to salary increases.  IBM asserts that Ghedi is in the same pay band as most of the other employees that perform the same job.  IBM also claims that promotions from band 3 to band 4 are fairly infrequent.  Finally, IBM points to the fact that Ghedi's pay in 2003 and 2004 was higher than eleven comparable employees with longer years of service.

Ghedi's allegations focus on the amount of work he does, the pay that he receives for that

---

[2]        The Court will consider Ghedi's claims in light of its earlier finding that the MHRA's one-year statute of limitations applies to the claims.  Thus, the Court will not consider Ghedi's hiring claim as it occurred outside of the one-year window.

work, and the fact that IBM has not advanced him from band 3 to band 4 on its payscale.  However, the record indicates that Ghedi's inability to advance is not based on discriminatory animus, but on the fact that the IBM payscale considers both productivity and seniority in granting raises and advancing employees.  Ghedi's ability to advance in pay is also hindered by the fact that few IBM employees have moved from pay band 3 to pay band 4 in the last several years.

A review of Ghedi's compensation record shows that he is paid more than any other Somali in his department and that his pay places him right in the middle of his department as a whole.  The record also shows that Ghedi is paid more than a number of employees that have worked at IBM for a longer period of time.  Based on these considerations, the Court finds that Ghedi has not presented sufficient evidence that he suffered an adverse employment action with regard to his salary.

**B.    Raise and Tuition Reimbursement**

Ghedi's second claim is that he was initially denied a 3% raise that was granted to all of the members of his department and that he was denied a tuition reimbursement that he was entitled to receive.  IBM acknowledges that Ghedi did not receive the 3% raise on time, but points to the fact that the raise was granted once IBM's accounting department was made aware of its error.  IBM also notes that Ghedi was not denied the tuition reimbursement, but was told by Gordon that he [Gordon] would need to discuss the reimbursement with Zoller.  Ultimately, IBM approved Ghedi's reimbursement request.

The Court has examined Ghedi's claims with regard to the raise and the tuition reimbursement and finds that neither constitutes an adverse employment action.  Although the Court disagrees with IBM's assertion that no adverse employment action can be found where corrective action has been

taken, the Court finds that in this case IBM's conduct was not actionable because IBM granted Ghedi

the raise immediately after it became aware of the error.  The Court also finds that no actionable

conduct exists with regard to the delay in Ghedi receiving his tuition reimbursement.

C.      Performance Evaluation

Ghedi asserts that his performance review ratings are evidence of the discrimination he faced at

IBM.  Specifically, Ghedi complains about the September 2003 performance review during which

Gordon told Ghedi that he would be rated a "3" on a 1 to 4 scale.  IBM asserts that the "3" rating was

recommended to Gordon by Konczyk.  IBM also points to the fact that Ghedi received a "2" rating on

the September 2003 performance review after Morizio questioned the consistency of IBM's method of

evaluating employees who had been rotated through other departments.

The Court finds that the performance review rating actually awarded to Ghedi is not evidence

of discriminatory conduct.  Konczyk recommended that Gordon rate Ghedi's performance a "3" on the

performance review scale.  Gordon agreed and was prepared to rate Ghedi as such but Morizio

recommended a higher rating.  Ultimately, Ghedi was rated a "2" on the performance review scale.  The

Court finds nothing in the record that would constitute an adverse employment action with regard to the

"2" rating.

D.      Promotions

Ghedi asserts that IBM's failure to hire him for several positions within the company is evidence

of discrimination.  As noted above, Ghedi has applied for over 50 jobs while working for IBM.  IBM

asserts that Ghedi was not selected to fill certain positions for a variety of non-discriminatory reasons

and that a number of the positions that Ghedi applied for were either eliminated or never filled.

13

The Court finds that IBM has presented legitimate, non-discriminatory bases for its actions and that Ghedi has failed to show that the reasons asserted by IBM were merely pretextual. Ghedi applied for three positions at IBM within the previously discussed one-year statue of limitations. One of those positions was filled by a candidate for whom the position would be a lateral transfer rather than a promotion. The remaining two positions were filled by candidates who were familiar with the position's requirements without additional training. Ghedi has presented no evidence that would rebut IBM's stated rationale for hiring these individuals. Thus, the Court finds that Ghedi has no claim with regard to his lack of promotions while at IBM.

After reviewing Ghedi's race and national origin discrimination claims, the Court finds that he has failed to present evidence of a *prima facie* case with regard to certain claims and as to others he has been unable to show that IBM's asserted bases are merely pretext. Accordingly, the Court grants IBM's Motion for Summary Judgment as to this claim.

## IV.     Retaliation Claim

Ghedi asserts that IBM violated the MHRA when it retaliated against him for complaining of IBM's discriminatory actions. The tripartite analysis set forth in *McDonnell Douglas* is applicable to Ghedi's claims of retaliation. In order to establish a prima facie case of retaliation under the MHRA, Ghedi must show that: (1) he engaged in statutorily-protected conduct; (2) he suffered an adverse action; and (3) a causal connection exists between Ghedi's protected conduct and the adverse action. *Bergstrom-Ek v. Best Oil Co.*, 153 F.3d 851, 859 (8th Cir. 1998).

Ghedi contends that his efforts at remedying the alleged discrimination at IBM angered management. As a result, Ghedi claims that he was not promoted, paid, or treated as well as other

employees.  Ghedi cites two specific incidents in support of his retaliation claim.  First, Ghedi points to the fact that Gordon wrote an angry e-mail in which he stated that he was "pissed off" at Ghedi for failing to file the proper forms in requesting a tuition reimbursement.  Second, Ghedi contends that at a meeting with Gordon and Adam Moffat, an IBM human resources representative, Ghedi was told by Gordon that his complaints of racial discrimination would no longer be tolerated.

IBM asserts that Ghedi has not suffered any adverse employment actions as a result of his complaints.  IBM contends that Gordon's statement about being "pissed off" at Ghedi was an isolated incident that concerned Ghedi's failure to file his paperwork in a timely manner.  IBM also contends that Ghedi was never told that he could not report allegedly discriminatory acts but was instead told that he would need to make his reports pursuant to the Open Door procedures.  IBM asserts that Ghedi sent Geraldo Abreu, IBM's Rochester Human Resources Manager, an e-mail after Ghedi met with Gordon and Moffat regarding Ghedi's concern that he would be retaliated against were he to make additional complaints.  In response, Abreu e-mailed Ghedi, assuring Ghedi that he had the right to complain about alleged discrimination and that no adverse action would be taken as a result of such complaints.

The Court finds that Ghedi has not presented a *prima facie* case of retaliation.  Ghedi clearly engaged in protected conduct in filing his Open Door policy claims.  However, the Court finds that none of the actions taken by IBM management and complained of by Ghedi constitute adverse employment actions.  Gordon's comment about being "pissed off" at Ghedi hardly rises to the level of being actionable conduct.  The second incident involving Gordon's alleged statement that Ghedi would be fired if he continued to file discrimination complaints is more problematic.  Nonetheless, the Court

finds that no adverse actions were taken against Ghedi by Gordon or IBM management and that Abreu's comments appear to have resolved the matter for the parties.  Accordingly, the Court grants IBM's Motion for Summary Judgment as to Ghedi's retaliation claim.

## V.       Hostile Work Environment

Ghedi also brings a harassment claim, alleging that he faced a hostile work environment on the basis of his race and national origin.  To succeed on a hostile work environment claim, Ghedi must prove four elements:  (1) membership in a protected group; (2) the occurrence of unwelcome harassment; (3) that the harassment was based on race or national origin; and (4) that the harassment affected a term, condition, or privilege of employment.  *Elmahdi v. Marriott Hotel Services, Inc.*, 339 F.3d 645, 652 (8th Cir. 2003).  To alter the terms and conditions of one's employment, conduct must be severe and pervasive, both objectively and subjectively.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-23 (1993).  When determining the severity and pervasiveness of an employer's conduct, several factors should be considered, including the frequency of the discriminatory conduct, its severity, whether the conduct is physically threatening or humiliating or merely offensive, and whether the conduct unreasonably interferes with an employee's work performance.  *Id.*

Ghedi asserts that IBM created a hostile work environment on the basis of his race and national origin.  The Court finds that the conduct complained of by Ghedi does not surpass the high threshold established in *Harris* for a hostile work environment claim.  Much of the conduct complained of is not harassment in any form and the remaining allegations do not rise to the requisite level required for hostile work environment claims.  Thus, Ghedi's hostile work environment claims are dismissed with prejudice.

### Conclusion

16

For the reasons stated, **IT IS HEREBY ORDERED:**

1.      Defendant International Business Machines, Inc.'s, Motion to Strike (Doc. No. 32) is

**DENIED**.

2.      Defendant International Business Machines, Inc.'s, Motion for Summary Judgment

(Doc. No. 12) is **GRANTED**.

3.      Plaintiff Abdulaziz Ghedi's Complaint is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  May 27, 2005                    s/Donovan W. Frank
                                        DONOVAN W. FRANK
                                        Judge of United States District Court

17